IN THE COURT OF APPEALS OF TENNESSEE
AT KNOXVILLE
April 12, 2024 Session

## TINA MARIE ELTZROTH v. DANNY RAY ELTZROTH

**Appeal from the Circuit Court for Sevier County**
**No. 21-CV-369-III     Rex H. Ogle, Judge**

### No. E2023-00484-COA-R3-CV

This appeal concerns setting aside a default judgment in a divorce case. Tina Marie Eltzroth ("Wife") filed for divorce in the Circuit Court for Sevier County ("the Trial Court") against Danny Ray Eltzroth ("Husband"). Husband was served but failed to timely answer. Wife filed a motion for default and notice of hearing. Husband, who was staying at multiple places during this time, failed to appear for the hearing. The Trial Court granted Wife a default judgment. Husband later filed a motion to set aside, which the Trial Court granted. Wife appeals. We find no abuse of discretion in the Trial Court's granting of Husband's motion to set aside the default judgment. We affirm.

**Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Circuit Court Affirmed;**
**Case Remanded**

D. MICHAEL SWINEY, C.J., delivered the opinion of the court, in which THOMAS R. FRIERSON, II, and KRISTI M. DAVIS, JJ., joined.

Felisha B. White, Seymour, Tennessee, for the appellant, Tina Marie Eltzroth.

Andrew E. Farmer, Sevierville, Tennessee, for the appellee, Danny Ray Eltzroth.

# OPINION

## Background

Husband and Wife married in December 2000. They have a minor child who was born in 2007. Over the course of the marriage, Husband dealt with drug addiction. In June 2021, Wife sued Husband for divorce in the Trial Court. Husband was served at the marital home; he nevertheless failed to file an answer within thirty days. In October 2021, Wife filed a motion for default and notice of hearing, copies of which were sent to the marital home. During this time, Husband moved around a lot. In November 2021, a hearing was held on Wife's motion for default judgment. Husband did not appear. The Trial Court granted Wife a default judgment, entering a final decree of divorce and permanent parenting plan.

Among the provisions in the final decree of divorce, Wife was granted an absolute divorce based on Husband's inappropriate marital conduct. Wife was also awarded the marital home and title to a vehicle. Husband was awarded his personal property in the home. He had thirty days to retrieve his personal property or otherwise forfeit it. The parties would split the outstanding medical bills for their minor child. The parties would maintain their respective checking and retirement accounts. Under the permanent parenting plan, Wife was designated the child's primary residential parent. Wife was granted 365 days per year with the child. Meanwhile, Husband was restricted to supervised visitation. Husband was ordered to pay $615.00 per month in child support. He also was assessed an arrearage of $3,690.00.

In August 2022, Husband filed a motion to set aside the order of default and final decree of divorce. Husband acknowledged having been served the complaint for divorce but stated that "he did not receive copies of the Motion for Default or any notice that a hearing had been set in this matter." Husband stated further that the divorce decree was "not a fair and equitable division of the parties' assets and debts." Wife filed a response in opposition, stating among other things that she had "advised [Husband] through text messages that the divorce had been finalized and [Husband] still failed to take action for over 9 months[.]". Wife filed a petition to enforce the final decree and for contempt against Husband.

In January 2023, the Trial Court heard Husband's motion to set aside. Husband submitted an affidavit in support of his motion. In his affidavit, Husband stated, as relevant:

1. I am the Defendant in the above-captioned matter.
2. A default hearing was held in this cause on November 2, 2021.

3. I was not present at the hearing of this cause and did not know about the scheduling of the hearing on or before November 2, 2021.

4. I would have been present at the hearing and would have presented a defense to the action filed by Plaintiff had I known that a hearing had been set.

5. I aver that I did not receive proper service of the Complaint for divorce as indicated on the Summons in the court file because I have not stayed in the marital home since on or about June 5, 2021.

6. If I had been served the Complaint for Divorce, I would have filed an Answer and Counter-Complaint had I been aware of the filing.

7. I only became aware of the Order for Default Judgement when I hired an attorney to file a Complaint for Divorce from the Plaintiff.

8. The Motion for Default Judgment and Notice of Hearing were mailed to the marital residence where the Plaintiff knew that I had not resided since on or about June 5, 2021.

9. From June 5, 2021 to December 24, 2021 I stayed with friends in Middle Tennessee.

10. Since Plaintiff knew I was not residing in the marital residence with her, it is presumable that her attorney would have known before the notice was sent.

11. The provisions of the Order for Default Judgment and Final Decree are not a fair and equitable division of the parties assets or debts.

12. The provisions of the Order for Default Judgment and Permanent Parenting Plan are not in the best interest of the parties' minor child.

Husband also testified at the hearing. On cross-examination, Husband was pressed about his awareness at the relevant times of the litigation against him:

Q. Mr. Eltzroth, will you tell me if you recognize these messages?
A. I believe so, yeah.
Q. On October 26th, 2021 at 5:10 p.m., what did you message to Ms. Eltzroth?
A. Coming back in a couple days --
Q. Can you speak up?
A. Coming back in a couple days for court and sign papers and pack up.
Q. And October 26th of 2021, this was six days before the default judgment, correct?
A. I guess.
Q. Well, default judgment was on November 2nd.
A. Yeah. I'm saying if I knew about the default judgment, why would I not be there?

Q. Mr. Eltzroth, did you not say coming back in a couple of days for court and to sign papers and pack up?

A. It wasn't nothing to do with that court. I had other court.

Q. So what other court did you have?

A. Illegal court from -- it was over missing court or something on a -- I don't know what it was for, but I had a court date, not through the divorce stuff.

Q. What did you have court on?

A. I don't even know. And I just know that's what my message -- I remember sending it for that reason.

Q. Well, during this time, what else did you have pending?

A. I don't know.

THE COURT: Well, you just said you had other court.

THE WITNESS: Yeah, I had --

THE COURT: So what else did you have?

THE WITNESS: I believe it was in October. It was not over the divorce.

Q. What was it for?

A. I think it was for missing court.

THE COURT: Of what?

THE WITNESS: Over like a violation of probation, violation or something. I don't even remember what the probation was for.

***

Q. Okay. So, Mr. Eltzroth, when you say in that that you were going to come back in and sign papers, did you mean sign papers for the divorce?

A. No. I mean to get an attorney to file for divorce.

Q. Okay. And that was in October. Did you file anything about the divorce in October?

A. Well, I was trying to deal with getting the money, so I was calling around.

Q. Did you file anything in October dealing with the divorce?

A. I don't believe so, not that I remember.

Q. Did you file anything in November with the divorce?

A. No, not that I -- I don't know what time we did it. I just called him and --

Q. Is there something wrong with your memory?

A. Huh?

Q. Is there something wrong with your memory?

A. I don't believe so.

Q. Okay. Mr. Eltzroth, you testified then that you saw papers on -- Mr. Farmer asked you when the next time you saw papers was and you said

-4-

November 2nd when you said that you saw the papers and they were crazy papers and you didn't agree.

A. I'm not even sure it was on November 2nd. I mean, I don't know. That's been so long ago. I don't know.

Q. Well, you testified that you saw them on November 2nd, that Ms. Eltzroth gave them to you, and that they were crazy papers and you didn't agree to them.

A. Well, I'm not going to say for sure that's the ones. I've had three or four sets of them. And I wasn't agreeing to them, no. And I don't know what day it was.

Q. Okay. Well, you testified it was November 2nd, so what action did you take on November 2nd?

A. I don't think I took any action. I don't know.

***

Q. So after Ms. Eltzroth tells you that it has been finalized and the house was awarded to her, that was in January, January 11th of 2022, but yet, you waited until seven months before filing anything with the Court; is that correct?

A. Yeah, because I thought we was going to work it out.

Q. But she tells you that it's been finalized --

A. And I --

Q. -- but you still waited seven months?

A. I looked and it wasn't, so -- it still had my name. It was just --

Q. Who was making the payments on the house for those seven months?

A. The seven months that I wasn't living there?

Q. Who has made the payments on the house since June of 2021?

A. '21? Tina has, I believe. But in an apartment down there Mom was living there, so I figured she would have to make the payments.

Q. My question is, you've not been making the payments, though, correct?

A. Not since then, but the years before, I was.

Wife testified, as well. On cross-examination, Wife was asked whether she knew where Husband stayed all along and whether Husband's memory was affected by his drug use. Wife testified, in part:

Q. All right. But based off your testimony, sounds like [Husband] had a real problem in May moving forward and even before then. So it would be fair to say he may not remember being served, would it?

A. No, I wouldn't say that's fair to say, no. I mean, he remembered everything else, so -- no, I'm not going to agree to that. His memory is fine.

I don't think that he didn't remember being served papers. He knew he was served papers, especially when I -- we talked about it.

Q. So you would agree that a drug addict using drugs has just as clear a mind as you are sitting here today?

A. No. I'm telling you I don't know when he was on drugs, is what I said, because he is an angry person, and whether he was angry from drugs or just angry from being angry, I don't know. I couldn't define the two.

Q. But you could have easily gotten in touch and found out where your husband lived, couldn't you?

A. No.

Q. You didn't have [Husband's sister] Allison's phone number?

A. Yeah. She called me and cussed me out one end to the other. She told you that. She said a lot of things she shouldn't have said. We did not have a good relationship. They wouldn't have given me anything like that. They would not have done that.

Q. You could have called Nadine[, someone Husband stayed with], couldn't you? You had spoken with Nadine as well.

A. Yeah. And we talked about -- I talked to Nadine about us being divorced even after the fact. So, yeah, he knew, so I'm not really sure where you're going with this.

Q. I'm just making a point that you knew where your husband was this entire time.

A. No, not at all times. I knew he was at Nadine's.

Q. Right.

A. But hopped around from house to house. He didn't have an address. He never had a permanent -- he just -- he couch-hopped, so I don't know -- I have better things to do than wonder where he's at all the time.

***

Q. And I guess the real question is, is that you could have told your lawyer that he was very rarely home and that he could've been served or been contacted through either Allison or Nadine; is that correct?

A. I actually gave them -- it might have been child support.

THE COURT: You did what?

THE WITNESS: I can't remember if it was -- Felisha might be able to answer this. I don't know if it was her office, but I think I gave her Allison's address, and I couldn't get anybody else's address in Nashville. But Allison's was the only one I knew, which was the sister in Dandridge. But there's no way of knowing when he's there either, so --

Q. So is it your testimony that you gave your attorney an alternate address that --

A. Well, that's why I said that she could answer that probably. I don't know if it was her or the child support that I gave that address to.

Q. But you did attempt to give an alternate address to someone?

A. To have him served.

Q. To have him served.

A. For child support I know I did. But I don't remember if it was to have him served for that, because like I said, I don't really know -- I don't know where all he was at. I just know he was in Nashville. Where he was staying was sometimes with a friend, sometimes with family. I mean, I didn't keep up with him. I didn't need to keep up with him. I was trying to avoid that.

Q. I understand that. And then before the default went down and you got everything you wanted, you're saying that you gave child support an alternate address to have him served at?

A. Yes. They asked me where he was at and I know that someone had told me that he was going to be at Allison's house for the week of Thanksgiving, so I called them and I said, hey, he's going to be there the week of Thanksgiving, because they had to serve him for child support papers, yeah. So I knew that he would be there then, so that's why I was able to do that.

Q. And I'm not trying to ask you over and over again --

A. That's okay.

Q. -- but just to be clear, so do you think you did or didn't provide --

A. I can't remember, to be honest with you.

Q. -- an alternate address to be served the default?

A. I honestly -- I can't say if I did or didn't. I can't remember if I did or not. But I know I did for child support for sure, yeah, because the week of Thanksgiving, I know he was at his sister's house, so that's why I did that then.

In March 2023, the Trial Court entered its final order. The Trial Court granted Husband's motion to set aside default judgment. In its order, the Trial Court stated, as relevant:

1. That the petitioner in this case, the movant, has established a case for relief under Rule 60.02.

2. That there are issues pertaining to the disposition of the property, some reasonable disagreement about the allocation of the ownership of the property, the payment of any debts, the reimbursement of any payments made by anybody and those are issues the Court could properly consider.

3. The Court does not see any legal prejudice with going forward with a final hearing on this matter.

4 That it is unclear to the Court whether the Defendant actually received notice of the Default.

5. That the Court stated in its opinion, "[t]he policy of the law is to give everybody as we possibly can a fair shot at being heard in a trial, and that's what 60.02 is about."

6. That the Court further went on to state, ". . .based upon everything that the Court has heard, the totality of the circumstances, that it is the right thing to do to set this matter aside and proceed to a final hearing."

The Trial Court attached to its final order a transcript of its oral ruling. In its oral ruling, the Trial Court discussed its reasoning as follows:

> THE COURT: Courts have a clear preference for deciding a case on the merits rather than pursuant to a default judgment, and thus will construe 60.02 liberally when default judgments are at issue.
>
> A request to vacate a default judgment in accordance with Rule 60.02 should be granted if there is reasonable doubt as to the justice of dismissing a case before it can be heard on the merits. Whether the default was willful. Well, in the sense that the -- it was the intent, of course, to take the default, obviously.
>
> The second thing is whether defendant has a meritorious defense. Now, there are issues pertaining to the disposition of the property that, based on the testimony that the Court has heard today, that there would be some dispute, some reasonable disagreement about the allocation of the ownership of the property, the payment of any debts, the reimbursement of any payments made by anybody. Those are issues that the Court could properly consider.
>
> And then another citation in the *Henry* case, the Court should grant relief pursuant to Rule 60.02 if the Court has any reasonable doubt about whether judgment should be set aside. I don't think the fact that the setting aside of the judgment would deprive the wife of a hundred percent of the property is the definition of prejudice contemplated by the rule. I do not think that's what the rule means. And therefore, I do not see any prejudice, legal prejudice to us going forward with a final hearing on this matter.
>
> The question of notice of the default, of him actually having actual notice of the default is unclear to the Court. For those reasons, based upon the proof in the record, and there's disparity in the proof on certain issues, the Court thinks that the petitioner in this case, the movant has established a case for relief under Rule 60.02, and I do grant that relief.

***

THE COURT: The Court had made some notes, and one of the things that the Court wanted to deal with was on January 11th of '22, as I understand the testimony, and again, some of it has been a little bit unclear because of maybe the Court did not properly hear all of it, but be that as it may, there was a screen shot of portions of the final judgment as it relates to the property sent to the husband in this case. And so I think then, of course, the motion to set aside -- and then I want to go through the dates again. The default was filed and the final judgment on November 2nd of '21. The husband filed for his own divorce on July 19th, '22. Now, the question is, did he or did he not understand from the screen shot talking about the property that he was already divorced? I don't know. I don't know.

But he did file after he had filed for divorce and it was dismissed, he filed a motion then, a fairly prompt motion to set aside the default. And so I go back again, and I want to reiterate, because this may be subject to appellate review, and that's fine if it is, but the policy of the law is to give everybody as we possibly can a fair shot at being heard in a trial, and that's what 60.02 is about. And I just think that based upon everything that the Court has heard, the totality of the circumstances, that it is the right thing to do to set this matter aside and proceed to a final hearing.

Wife timely appealed to this Court.

## **Discussion**

Although not stated exactly as such, Wife raises the following issue on appeal: whether the Trial Court erred in granting Husband's motion to set aside default judgment.

Our review is *de novo* upon the record, accompanied by a presumption of correctness of the findings of fact of the trial court, unless the preponderance of the evidence is otherwise. Tenn. R. App. P. 13(d); *Bogan v. Bogan*, 60 S.W.3d 721, 727 (Tenn. 2001). A trial court's conclusions of law are subject to a *de novo* review with no presumption of correctness. *S. Constructors, Inc. v. Loudon Cnty. Bd. of Educ.*, 58 S.W.3d 706, 710 (Tenn. 2001).

Husband sought to set aside default judgment pursuant to Rule 60.02 of the Tennessee Rules of Civil Procedure. Rule 60.02 provides, as pertinent:

-9-

On motion and upon such terms as are just, the court may relieve a party or the party's legal representative from a final judgment, order or proceeding for the following reasons: (1) mistake, inadvertence, surprise or excusable neglect; (2) fraud (whether heretofore denominated intrinsic or extrinsic), misrepresentation, or other misconduct of an adverse party; (3) the judgment is void; (4) the judgment has been satisfied, released or discharged, or a prior judgment upon which it is based has been reversed or otherwise vacated, or it is no longer equitable that a judgment should have prospective application; or (5) any other reason justifying relief from the operation of the judgment. The motion shall be made within a reasonable time, and for reasons (1) and (2) not more than one year after the judgment, order or proceeding was entered or taken.

Tenn. R. Civ. P. 60.02. "When a party seeks relief from a final judgment pursuant to Rule 60.02, the burden of proof rests with that party." *Henry v. Goins*, 104 S.W.3d 475, 482 (Tenn. 2003). This Court has stated:

> We review a trial court's entry of a default judgment and its refusal to set that judgment aside pursuant to a Tenn. R. Civ. P. 60.02 motion under an abuse of discretion standard. *Tenn. Dep't of Human Serv. v. Barbee*, 689 S.W.2d 863, 866 (Tenn. 1985). However, in the interests of justice, the courts have expressed a clear preference for a trial on the merits. *Id*. Thus, rule 60.02 is construed liberally in the context of default judgments. *Id*. at 867. In deciding whether to grant a rule 60.02 motion to set aside the default judgment, courts consider three criteria: 1) whether the default was willful; 2) whether the defendant has asserted a meritorious defense; 3) the amount of prejudice which may result to the non-defaulting party. *Id*. at 866. If there is any reasonable doubt about whether the judgment should be set aside, the court should grant relief. *Nelson v. Simpson*, 826 S.W.2d 483, 486 (Tenn. Ct. App. 1991).

*Reynolds v. Battles*, 108 S.W.3d 249, 251 (Tenn. Ct. App. 2003). The Tennessee Supreme Court has explained further that the law is clear that "the disposition of motions under Rule 60.02 is best left to the discretion of the trial judge." *Henderson v SAIA, Inc.*, 318 S.W.3d 328, 335 (Tenn. 2010).

In *Lee Med., Inc. v. Beecher*, 312 S.W.3d 515 (Tenn. 2010), the Tennessee Supreme Court discussed the abuse of discretion standard at length, stating:

> The abuse of discretion standard of review envisions a less rigorous review of the lower court's decision and a decreased likelihood that the

decision will be reversed on appeal. *Beard v. Bd. of Prof'l Responsibility*, 288 S.W.3d 838, 860 (Tenn. 2009); *State ex rel. Jones v. Looper*, 86 S.W.3d 189, 193 (Tenn. Ct. App. 2000). It reflects an awareness that the decision being reviewed involved a choice among several acceptable alternatives. *Overstreet v. Shoney's, Inc.*, 4 S.W.3d 694, 708 (Tenn. Ct. App. 1999). Thus, it does not permit reviewing courts to second-guess the court below, *White v. Vanderbilt Univ.*, 21 S.W.3d 215, 223 (Tenn. Ct. App. 1999), or to substitute their discretion for the lower court's, *Henry v. Goins*, 104 S.W.3d 475, 479 (Tenn. 2003); *Myint v. Allstate Ins. Co.*, 970 S.W.2d 920, 927 (Tenn. 1998). The abuse of discretion standard of review does not, however, immunize a lower court's decision from any meaningful appellate scrutiny. *Boyd v. Comdata Network, Inc.*, 88 S.W.3d 203, 211 (Tenn. Ct. App. 2002).

Discretionary decisions must take the applicable law and the relevant facts into account. *Konvalinka v. Chattanooga-Hamilton County Hosp. Auth.*, 249 S.W.3d 346, 358 (Tenn. 2008); *Ballard v. Herzke*, 924 S.W.2d 652, 661 (Tenn. 1996). An abuse of discretion occurs when a court strays beyond the applicable legal standards or when it fails to properly consider the factors customarily used to guide the particular discretionary decision. *State v. Lewis*, 235 S.W.3d 136, 141 (Tenn. 2007). A court abuses its discretion when it causes an injustice to the party challenging the decision by (1) applying an incorrect legal standard, (2) reaching an illogical or unreasonable decision, or (3) basing its decision on a clearly erroneous assessment of the evidence. *State v. Ostein*, 293 S.W.3d 519, 526 (Tenn. 2009); *Konvalinka v. Chattanooga-Hamilton County Hosp. Auth.*, 249 S.W.3d at 358; *Doe 1 ex rel. Doe 1 v. Roman Catholic Diocese of Nashville*, 154 S.W.3d [22,] 42 [(Tenn. 2005)].

To avoid result-oriented decisions or seemingly irreconcilable precedents, reviewing courts should review a lower court's discretionary decision to determine (1) whether the factual basis for the decision is properly supported by evidence in the record, (2) whether the lower court properly identified and applied the most appropriate legal principles applicable to the decision, and (3) whether the lower court's decision was within the range of acceptable alternative dispositions. *Flautt & Mann v. Council of Memphis*, 285 S.W.3d 856, 872-73 (Tenn. Ct. App. 2008) (quoting *BIF, a Div. of Gen. Signal Controls, Inc. v. Service Constr. Co.*, No. 87-136-II, 1988 WL 72409, at *3 (Tenn. Ct. App. July 13, 1988) (No Tenn. R. App. P. 11 application filed)). When called upon to review a lower court's discretionary decision, the reviewing court should review the underlying factual findings using the preponderance of the evidence standard contained

in Tenn. R. App. P. 13(d) and should review the lower court's legal determinations de novo without any presumption of correctness. *Johnson v. Nissan N. Am., Inc.*, 146 S.W.3d 600, 604 (Tenn. Ct. App. 2004); *Boyd v. Comdata Network, Inc.*, 88 S.W.3d at 212.

*Beecher*, 312 S.W.3d at 524-25. With respect to credibility determinations, the Tennessee Supreme Court has instructed:

> When it comes to live, in-court witnesses, appellate courts should afford trial courts considerable deference when reviewing issues that hinge on the witnesses' credibility because trial courts are "uniquely positioned to observe the demeanor and conduct of witnesses." *State v. Binette*, 33 S.W.3d 215, 217 (Tenn. 2000). "[A]ppellate courts will not re-evaluate a trial judge's assessment of witness credibility absent clear and convincing evidence to the contrary." *Wells v. Tennessee Bd. of Regents*, 9 S.W.3d 779, 783 (Tenn. 1999); *see also Hughes v. Metro. Gov't of Nashville & Davidson Cnty.*, 340 S.W.3d 352, 360 (Tenn. 2011). In order for evidence to be clear and convincing, it must eliminate any "serious or substantial doubt about the correctness of the conclusions drawn from the evidence." *State v. Sexton*, 368 S.W.3d 371, 404 (Tenn. 2012) (quoting *Grindstaff v. State*, 297 S.W.3d 208, 221 (Tenn. 2009)). Whether the evidence is clear and convincing is a question of law that appellate courts review de novo without a presumption of correctness. *Reid ex rel. Martiniano v. State*, 396 S.W.3d 478, 515 (Tenn. 2013), (citing *In re Bernard T.*, 319 S.W.3d 586, 596-97 (Tenn. 2010)), *cert. denied*, ⸺ U.S. ⸺, 134 S.Ct. 224, 187 L.Ed.2d 167 (2013).

*Kelly v. Kelly*, 445 S.W.3d 685, 692-93 (Tenn. 2014).

Wife argues in her brief that the Trial Court erred by considering her willfulness rather than Husband's willfulness. Wife states further that the choice to take illegal drugs cannot serve as grounds for excusable neglect, and that the Trial Court wrongly considered Husband's drug addiction.[1] Continuing her argument, Wife notes that Husband was in and out of the marital home during the relevant timeframe, yet he failed to update his address. Wife cites among other cases *Napier v. Napier*, No. M2019-00978-COA-R3-CV, 2020 WL 4299404 (Tenn. Ct. App. July 27, 2020), *no appl. perm. appeal filed*, a case in which we found no abuse of discretion in the trial court's decision to deny the father's motion to set

---

[1] The Trial Court remarked at one point during the hearing: "And I think I'll just go ahead and say this, some of [Husband's] misunderstanding was drug-fueled. That's clear to the Court." However, the Trial Court, addressing Wife's counsel, later clarified: "Your office or no process server has to determine the sobriety of a person served. There's no requirement in the law for that. So you're right on point on that."

aside default judgment. *Id*. at *1. We observed in *Napier* that "[d]espite moving multiple times even after the withdrawal of his attorney in October 2017, [the father] never made a formal, written effort to update his address following his move . . . ." *Id*. at *7. In addition, Wife argues that Husband failed to demonstrate that he has a meritorious defense. Wife says that Husband's assertions that the divorce decree was neither fair nor equitable, and that the parenting plan was not in the child's best interest, were conclusory. Finally, as regards prejudice, Wife states that setting aside the default judgment will allow Husband to be around the child once again, and that Wife will be unable to seek enforcement of previously-ordered child support. She says further that Husband's approximately eight-month delay in seeking to set aside the default judgment was excessive. Husband, for his part, cites his testimony reflecting that he did not know in advance about the default hearing. He also points out that Wife was able to locate him for child support purposes, but not for default judgment purposes.

The Trial Court found that Wife intended to seek a default judgment. Respectfully, however, that is true for every party that seeks a default judgment. The willfulness factor concerns the defaulting party. *See Discover Bank v. Morgan*, 363 S.W.3d 479, 493-94 (Tenn. 2012). Thus, we agree with Wife that the Trial Court misspoke as to this factor. Nevertheless, the Trial Court's misstatement was not dispositive. Elsewhere in its order, the Trial Court stated that "[t]he question of notice of the default, of him actually having actual notice of the default is unclear to the Court. For those reasons, based upon the proof in the record, and there's disparity in the proof on certain issues, the Court thinks that the petitioner in this case, the movant has established a case for relief under Rule 60.02 . . . ." This finding by the Trial Court reflects a lack of willfulness on Husband's part even though the Trial Court did not say so explicitly. The finding also is supported by evidence in the record. There was conflicting testimony below regarding Husband's knowledge of the litigation at the relevant times. The Trial Court had an evidentiary basis to reach the conclusion it did. While Wife cites *Napier* for the proposition that a party has a duty to update his or her address, the trial court in *Napier* did not credit the father's explanation for his failure to give notice to the court of his change in address, a credibility determination we left undisturbed. 2020 WL 4299404, at *8. In the present case, the Trial Court made no such credibility determination against Husband.

Regarding whether Husband asserted a meritorious defense, Wife says that Husband's assertions were conclusory. It is true that Husband's defense was rather generic. Even still, it is not hard to discern what he objected to. Domestic matters typically are fact-intensive and involve the weighing of multiple factors. Here, Wife received among other things the marital home and a full 365 days per year with the parties' child. Perhaps even a contested hearing would have yielded this result. However, there is at least a reasonable possibility that, had Husband put on a case, he would have fared better than he did. *See Obi v. Obi*, No. M2010-00485-COA-R3-CV, 2011 WL 2150733, at *5 (Tenn. Ct. App.

-13-

June 1, 2011), *no appl. perm. appeal filed* ("The Parenting Plan affects Husband's rights and financial obligations with respect to his children, and he should not be denied the opportunity to present his arguments to the court on these matters."). As the Trial Court put it, "there would be some dispute, some reasonable disagreement about the allocation of the ownership of the property, the payment of any debts, the reimbursement of any payments made by anybody." Under the circumstances of this case, this factor also favors setting aside the default judgment.

Finally, regarding prejudice to the non-defaulting party, this Court in *Nelson v. Simpson* discussed a scenario in which we found no prejudice, stating that "[t]he Nelsons have not demonstrated that Mr. Simpson's failure to file an answer within thirty days after the March, 1990 letter has resulted in the loss of evidence or has increased the difficulty of discovery. The mere passage of time is not the sort of prejudice that supports declining to set a default judgment aside." *Nelson v. Simpson*, 826 S.W.2d 483, 486 (Tenn. Ct. App. 1991). Likewise, in the present case, the mere passage of time is insufficient to show prejudice to Wife. There is no hint in the record that Wife would, for example, be unable to put on proof or conduct discovery if she were to proceed to trial. That a non-defaulting party stands to lose the benefit of a favorable default judgment if that judgment is set aside cannot be the sole basis for a finding of prejudice or this factor would always favor the non-defaulting party. As a final matter, we observe as did the Trial Court the preference in Tennessee for resolving cases on their merits.

The evidence does not preponderate against the Trial Court's findings made with respect to each factor in the analysis for determining whether to grant Husband's motion to set aside default judgment. The Trial Court's decision to grant Husband's motion to set aside default judgment was properly supported by the evidence in the record; was based on the most appropriate legal principles applicable to the decision; and was within the range of acceptable alternative dispositions. In sum, the Trial Court did not abuse its discretion. We affirm.

## Conclusion

The judgment of the Trial Court is affirmed, and this cause is remanded to the Trial Court for further proceedings and for collection of the costs below. The costs on appeal are assessed against the Appellant, Tina Marie Eltzroth, and her surety, if any.

_____
D. MICHAEL SWINEY, CHIEF JUDGE

-14-